IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LARRY EDMOND,

                    Petitioner,

        v.                              CASE NO. 20-3248-SAC

JEFF BUTLER, Warden,
El Dorado Correctional Facility,

                    Respondent.


<u>MEMORANDUM AND ORDER</u>

    This matter is a petition for habeas corpus filed under 28 U.S.C. § 2254. Petitioner challenges his convictions of attempted second-degree murder, aggravated kidnapping, aggravated battery, and robbery, alleging he was denied a fair trial by ineffective assistance of counsel, the exclusion of evidence allegedly showing racial bias in the jury, and insufficiency of the evidence.

    The court has carefully considered the record and, for the reasons that follow, declines to grant relief in this matter.

**Procedural background**

    On August 17, 2012, petitioner was convicted in the District Court of Sedgwick County. On September 28, 2012, he was sentenced to a term of 586 months incarceration. Petitioner filed a direct appeal.

    On May 19, 2014, he filed a motion to correct illegal sentence. On October 9, 2014, however, he withdrew that motion and filed a renewed motion to correct illegal sentence.

    On May 23, 2014, the Kansas Court of Appeals (KCOA) affirmed petitioner's convictions. *State v. Edmond*, 324 P.3d 1153 (Table), 2014 WL 2402001 (Case No. 109,617)(Kan. Ct. App. 2014)(unpublished

opinion).

On October 15, 2014, the district court denied the motion to correct illegal sentence.

On June 30, 2015, the Kansas Supreme Court (KSC) denied review of petitioner's direct appeal.

On June 16, 2016, petitioner filed a motion for post-conviction relief under K.S.A. 60-1507 in the district court.

On July 21, 2017, the district court denied relief. Petitioner filed an appeal.

On May 6, 2019, petitioner filed another motion to correct illegal sentence in the district court. On June 12, 2019, the district court denied the motion. Petitioner appealed.

On December 13, 2019, the KCOA affirmed the denial of petitioner's motion filed under K.S.A. 60-1507. *Edmond v. State*, 453 P.3d 1208 (Table), 2019 WL 6794879 (Case No. 119,226)(Kan. Ct. App. 2019)(unpublished opinion).

On April 14, 2020, petitioner filed an emergency motion to correct illegal sentence in the district court, and on April 28, 2020, he filed an amended emergency motion to correct illegal sentence. The district court denied these motions in rulings issued on April 29, 2020, and May 15, 2020. Petitioner filed an appeal.

On September 24, 2020, the KSC denied review of petitioner's action under 60-1507.

On September 24, 2021, the KCOA affirmed the denial of petitioner's emergency motions to correct illegal sentence. *State v. Edmond*, 495 P.3d 415 (Table), 2021 WL 435234 (Case No. 123,087)(Kan. Ct. App. 2021).

On October 2, 2020, petitioner filed the present petition. On

July 12, 2021, he filed the second amended petition, the operative petition in this matter.

### Factual background

The KCOA summarized the factual background of petitioner's conviction as follows:

> On October 10, 2011, Edmond and other individuals took keys from an acquaintance, Danny Hendricks, and left in Hendricks' truck. Hendricks testified that he did not report the robbery because he was afraid and only wanted to regain possession of his vehicle. Six days later, on October 16, 2011, Hendricks attempted to recover the truck from an apartment complex.
>
> When Hendricks went inside one of the apartment buildings, he heard a "bunch of ruckus" upstairs, but a relative of Edmond's kept Hendricks from accessing the stairwell. A group soon exited the stairwell which included Edmond; Edmond's sister, who was a resident of the apartment complex; and Tracey Williams, who was Edmond's girlfriend.
>
> Williams was surrounded by the group and, according to Hendricks, she appeared to have been severely beaten. Edmond and the others essentially dragged Williams to Hendricks' truck. They placed Williams inside the vehicle between Edmond, who was driving, and Edmond's cousin, who sat in the passenger seat.
>
> Edmond drove away and Hendricks was unable to follow the vehicle. Hendricks drove to Edmond's residence, where Edmond later arrived. Williams was still inside the truck, and Hendricks again observed that she had been severely beaten. Hendricks witnessed Edmond strike Williams in the mouth before he entered the residence, leaving Williams behind.
>
> Hendricks approached the truck and spoke with Williams. She said she was beaten at the apartment complex and then taken in the truck to a place near a river, where she was beaten again. Williams told Hendricks that Edmond choked her to the point of blacking out and that she had "soiled herself." Hendricks noticed his truck was muddy and that Williams smelled "pretty ... bad, ... almost like urine, sweat, everything."

Edmond soon stepped outside and told Hendricks to take Williams. Edmond exclaimed, "[T]hat's what happens when somebody crosses [me]." Williams asked Hendricks to take her to a friend's home to change her clothing. Williams then called her ex-husband and asked to borrow clothing belonging to their daughter. Upon her arrival with Williams [sic], the ex-husband noticed Williams' pants were wet. According to his testimony, Williams said she had "got into it with her boyfriend," and had "messed her pants up and she needed to change."

Hendricks and Williams decided to report the crimes against them to law enforcement. After Williams had changed, they went to the police station and made reports. The two then went to the residence of Williams' mother, Dorothy Fields, where Williams was also living.

Fields testified that she barely recognized her daughter. When she asked Williams who was responsible, she responded, "'You know'" and, after further questioning, "'Larry.'" Fields understood that Williams was referring to Edmond. Williams refused to say anything more about the incident. She went to bed, but in the morning her mother was unable to awaken her. Fearing Williams was dead, Fields called 911.

Williams was transported to the hospital, where she told Debra Hermes, a physician's assistant, that her boyfriend had "forced [her] into a truck [,] ... taken [her] to a creek, ... held [her] against her will for four hours, and ... beat [her] up during that time and choked [her]." Williams said she reported the incident to the police, but "the officer that initially interviewed her was not very nice and that they didn't seem to be very caring."

Hermes testified that Williams had swollen lips, swelling around both of her eyes, bleeding in her right eye, abrasions and bruising on the front of her neck, bruising over her chest, and tenderness over her abdomen. Although Williams specifically reported her boyfriend had struck her in the mouth and it "felt like her teeth were pushed up into her gums," she was in "so much pain and discomfort that she couldn't tolerate" an examination of her mouth. According to Hermes, a physician remarked about the evident violence of the beating, and both medical personnel were surprised when tests showed no broken bones.

Williams telephoned Detective Benjamin Jonker the next day and complained that Edmond should have been arrested for kidnapping as well as domestic violence. The detective examined the desk officer's report, which indicated that

Edmond had beaten and choked Williams but did not mention
that she was taken against her will. Detective Jonker
scheduled a formal interview with Williams.

As part of his investigation, Detective Jonker went to the
apartment complex and met with the property manager to
review surveillance videotapes. One videotape showed
Williams and Edmond leave an apartment on the second floor
of the building and remain in the corridor, where Edmond's
sister and one or two individuals joined them. The manager
testified "[i]t was obvious that there was some [sort of]
confrontation" occurring.

The surveillance videotape showed Williams and Edmond then
leave the corridor and enter the stairwell. Edmond's sister
glanced inside the stairwell, but she and the others
remained in the corridor. When a resident tried to enter
the stairwell, those individuals in the corridor prevented
it. The videotape also showed that about 3 to 4 minutes
later, Edmond's sister and the others entered the
stairwell, and Edmond, Williams, and the rest exited on the
lower level. The videotape did not show anyone strike
Williams, and it did not show if Williams had any injuries.

Another surveillance videotape was similar, showing Edmond
grab Williams by the arm and pull her towards the stairwell.
Yet another videotape showed Edmond and Williams standing
near the door to the stairwell, with Williams against a wall
and Edmond standing in front of her. Detective Jonker
testified that it appeared they were having a "heated
conversation." Williams was shaking her head, and when she
attempted to walk away, Edmond grabbed her arm and "yank[ed]
her into the stairwell area."

One videotape showed Hendricks "just sort of milling around
on the first floor" during these events. As the group exited
the stairwell, Hendricks "tail[ed] behind" them. Detective
Jonker testified he was unable to obtain a copy of the
surveillance videotapes before they were recorded over and,
as a result, they were not shown to the jury.

Detective Jonker interviewed Hendricks, who said Edmond was
intoxicated on October 16, 2011. Williams also confirmed
that Edmond was intoxicated. Williams said Edmond had
suspected her of taking money, and that Edmond's sister was
"basically egging [him] on, saying, 'She took your money.
She took your money.'" Williams said the confrontation at
the apartment complex related to this money, and that
Edmond's sister warned him not to hit her in the hallway
due to the security cameras.

Williams told the detective that once she and Edmond were out of the cameras' view, he started "'wailing on [her],'" causing her to lose consciousness several times. Williams said individuals were standing guard at either end of the stairwell to prevent witnesses. When these individuals thought they heard an elevator, Edmond's sister told Edmond to take Williams outside. They all then went to Hendricks' truck.

Williams said that after Edmond's cousin had left the truck, Edmond told her: "'You're going to die tonight.'" Edmond drove to the dead end of a dirt road along a river and asked Williams again about the money, struck her, and repeated that he was going to kill her. Edmond placed both of his arms around Williams' neck and started to strangle her. According to Detective Jonker, Williams was "very vivid in her description" of the strangulation:

> "[Williams] said that she felt like her eyeballs were going to pop out of her head. And then she says she loses consciousness. Again, going back to the questions that we typically ask on strangulation cases, I asked her if she had urinated or defecated on herself, and she says during the interview that she did both, and that she was actually washing the clothes as I was speaking to her. She said that when she came to, she felt like she was crying, and she reached up and tried to wipe the tear away and realized it was her eye that was actually bleeding."

Williams told Detective Jonker that she continued to plead that she had not taken Edmond's money. Edmond hit Williams again and blood landed on him as it sprayed from her mouth. Williams said Edmond finally drove back to his residence.

The State charged Edmond with attempted first-degree murder (K.S.A.2011 Supp. 21-5301[a] and K.S.A.2011 Supp. 21-5403[a][1]), aggravated kidnapping (K.S.A.2011 Supp. 21-5408[a][3],[b]), robbery (K.S.A.2011 Supp. 21-5420[a]), and aggravated battery (K.S.A.2011 Supp. 21-5413[b][1] [A]).

While Edmond was incarcerated awaiting trial, Edmond and Williams spoke by telephone. The jailhouse conversations were recorded, and Detective Jonker concluded from them that Edmond and Williams were conspiring to "make these charges go away."

The State played portions of the jailhouse telephone conversations for the jury. They begin with Williams' repeated, reproachful complaints to Edmond about her injuries. The conversation then turned to the cause of the injuries. Edmond told Williams the incident had occurred on the fourth floor of the apartment building, and when Williams corrected him, Edmond cursed and said, "'You got to get this straight.'" The two continued to talk in an insinuating manner about how Williams "'got into it with'" a woman prior to arriving at the apartment complex. Edmond suggested that Williams tell law enforcement officers and the district attorney's office that she "was on drugs for 3 to 4 days, she doesn't remember much of anything[,and] [w]hat she does remember was [Edmond] was trying to help her and get her out of there." Williams was heard worrying aloud that she was "going to have to basically get in trouble for lying."

Williams did, in fact, eventually tell the detective "she had lied about everything," and that she did not wish to testify at Edmond's preliminary hearing. Williams did testify at the preliminary hearing, but she recanted her earlier statements incriminating Edmond. Subsequently, the State was unable to locate Williams and she did not appear as a witness at Edmond's jury trial.

At the jury trial, the trial court found that Williams was an unavailable witness. As a consequence, the trial court admitted a redacted transcript of her preliminary hearing testimony into evidence. This testimony provided an exculpatory version of events similar to that discussed in the jailhouse telephone conversations. This testimony was also contrary to the incriminating accounts Williams initially related to Hendricks, her ex-husband, her mother, medical personnel, and law enforcement officers.

In his defense case, Edmond called as his sole witness, Officer Joletta Vallejo, the desk officer who had taken Williams' initial report. Officer Vallejo recalled Williams' account that "she and [Edmond,] her boyfriend[,] got in an argument about money, and that he had punched her several times and ... choked her." The officer had noted "minor injuries" on Williams' face, specifically "two bumps" around her eye and swelling about her lip. Officer Vallejo said she took photographs of the injuries and offered to contact emergency medical services, but Williams refused the offer of assistance. The officer recalled telling Williams that Edmond would be arrested for domestic violence.

The jury returned guilty verdicts on attempted
second-degree murder (K.S.A.2011 Supp. 21-5301[a] and
K.S.A.2011 Supp. 21-5403[a][1]) as a lesser-included
offense of attempted first-degree murder, and aggravated
kidnapping (K.S.A.2011 Supp. 21-5408[a][3],[b]), robbery
(K.S.A.2011 Supp. 21-5420[a]), and aggravated battery
(K.S.A.2011 Supp. 21-5413[b][1] [A]). Edmond was sentenced
to 586 months' of imprisonment.

*State v. Edmond*, 324 P.3d 1153, 2014 WL 2402001 at *1-4 (Kan. Ct. App.
2014).

### Standard of review

This matter is governed by the Antiterrorism and Effective Death

Penalty Act (AEDPA). Under the AEDPA, when a state court has

adjudicated the merits of a claim, a federal court may

grant habeas relief only if the state court decision "was contrary

to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United

States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the

State court proceeding," *id.* § 2254(d)(2). In this context, an

"unreasonable application of" federal law "must be objectively

unreasonable, not merely wrong." *White v. Woodall*, 134 S. Ct. 1697,

1702 (2014) (quotations omitted).

The court presumes the correctness of the fact-finding by the

state court unless petitioner rebuts that presumption "by clear and

convincing evidence." 28 U.S.C. § 2254(e)(1). *See also Wood v. Allen*,

558 U.S. 290, 301 (2010) ("a state-court factual determination is not

unreasonable merely because the federal habeas court would have

reached a different conclusion in the first instance").

These standards are intended to be "difficult to

meet," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and require

that state court decisions receive the "benefit of the

doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

A habeas petitioner generally must exhaust available state court remedies before seeking federal habeas relief. "A threshold question that must be addressed in every habeas case is that of exhaustion." *Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994). "The exhaustion requirement is satisfied if the federal issue has been properly presented to the highest state court, either by direct review of the conviction or in a postconviction attack." *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994).

The presentation of a claim "requires that the petitioner raise in state court the 'substance' of his federal claims." *Williams v. Trammell*, 782 F.3d 1184, 1210 (10th Cir. 2015). A federal court can excuse exhaustion "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).

The procedural default doctrine provides an additional limit to review in habeas corpus cases. A federal habeas corpus may not review "federal claims that were procedurally defaulted in state court – that is, claims that the state court denied based on an adequate and independent state procedural rule" – unless the prisoner demonstrates either cause for the procedural default and resulting prejudice or that the failure of the federal court to review the claim will result in a fundamental miscarriage of justice. *Davila v. Davis*, 137 S.Ct. 2058, 2064-65 (2017); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Likewise, where a petitioner fails to present a claim in the state courts, and would now be procedurally barred from presenting it if he returned to state court, there is an anticipatory procedural bar

which prevents the federal court from addressing the claim. *Anderson v. Sirmons*, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007). As in the case of other procedurally defaulted claims, a petitioner's unexhausted claims barred by anticipatory procedural default cannot be considered in habeas corpus unless he establishes cause and prejudice for his default of state court remedies or a fundamental miscarriage of justice. *Gray v. Netherland*, 518 U.S. 152, 162 (1996).

To demonstrate cause for the procedural default, petitioner must show that some objective factor external to the defense impeded his ability to comply with the state's procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Objective factors that constitute cause include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to [petitioner.]" *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (internal quotation marks omitted). Petitioner also must show "actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750.

A procedural default also may be excused if a petitioner can show that the failure to consider the defaulted claim would result in a fundamental miscarriage of justice. To proceed under this exception, petitioner "must make a colorable showing of factual innocence." *Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000). A petitioner seeking relief under a defaulted claim and asserting a claim of innocence must show that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006)(quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

## Discussion

*Ineffective assistance of counsel*

Claims alleging ineffective assistance are analyzed under the standards established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland*, "a defendant must show both that his counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *United States v. Holloway*, 939 F.3d 1088, 1102 (10th Cir. 2019) (internal quotation marks omitted). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Review of claims of ineffective assistance of counsel presented in habeas corpus is deferential to the state courts. *See Harmon v. Sharp*, 936 F.3d 1044, 1058 (10th Cir. 2019). "When assessing a state prisoner's ineffective-assistance-of-counsel claims on habeas review, [federal courts] defer to the state court's determination that counsel's performance was not deficient and, further, to the attorney's decision in how to best represent a client." *Id.* (internal quotation marks and brackets omitted).

Petitioner presents multiple claims of ineffective assistance of counsel. Respondent asserts that only two of the claims are not procedurally barred, namely, his claim that counsel failed to object to hearsay and violations of the Confrontation Clause and his claim that counsel was ineffective in failing to impeach witness Danny Hendricks. The court first addresses these claims.

Petitioner first claims that his right to the effective assistance of counsel was violated when his counsel failed to present objections based on hearsay and the Confrontation Clause when the

out-of-court statements of Tracey Williams were admitted through the testimony of other witnesses.

The KCOA thoroughly addressed these claims, stating:

Edmond argues in his supplemental brief that his trial counsel was ineffective for failing to object to the admission of Williams' preliminary hearing testimony and her out-of-court statements presented through the testimony of Hermes, Fields, Hendricks, and Jonker. He argues that this testimony was hearsay and it violated his rights under the Confrontation Clause of the United States and Kansas Constitutions. The State argues that Edmond identifies no specific testimony that he believed to be hearsay and thus did not adequately brief the issue. The State also argues that Edmond's arguments have no merit because on direct appeal to this court, in discussing Edmond's challenge to the sufficiency of the evidence, our court implicitly found that the statements met a hearsay exception.

To begin, the district court erred by relying on res judicata to summarily deny this claim. The district court summarily denied three of Edmond's claims—that the trial court erred in finding that Williams was unavailable, that the trial court erred in admitting hearsay statements of Williams, and that his trial counsel was ineffective for failing to object to Williams' hearsay statements—finding that these issues were addressed on his direct appeal. Edmond's direct appeal addressed his claims that the trial court erred in finding Williams unavailable and the trial court erred in admitting her hearsay statements. See *Edmond*, 2014 WL 2402001, at *10-11. But Edmond raised no claim in his direct appeal that his trial counsel was ineffective for failing to object to Williams' hearsay statements. Thus, the district court erred in summarily denying the ineffective assistance of counsel claim based on res judicata.

In any event, Edmond's claim has no merit. Edmond first argues that trial counsel was ineffective for failing to object to the admission of Williams' preliminary hearing testimony. But Edmond can show no prejudice based on trial counsel's failure to object. On direct appeal, this court agreed with the district court that Williams' preliminary hearing testimony was admissible because she was unavailable at trial. *Edmond*, 2014 WL 2402001, at *10-11. So even if trial counsel had objected, the preliminary

hearing testimony would have been admitted. Thus, Edmond
cannot show prejudice based on trial counsel's failure to
object to the admission of the preliminary hearing
testimony.

Edmond also argues that trial counsel was ineffective for
failing to object to the admission of Williams'
out-of-court statements to Hermes, Fields, Hendricks, and
Jonker. As the State points out, Edmond identifies no
specific testimony from these witnesses that he believed
to be hearsay. But even if some statements from these
witnesses were inadmissible hearsay, Edmond cannot show
prejudice. Contrary to Edmond's contention, even without
the alleged hearsay statements, the State still had other
evidence to support its case, including the surveillance
video that showed Edmond pulling Williams by the arm into
the stairwell. The State also presented Hendricks'
first-hand observations of the group leaving the apartment
and dragging Williams to the truck; Edmond, Williams, and
Edmond's cousin driving off in the truck; and Williams'
injuries when the group came back. Hendricks also testified
that he saw Edmond hit Williams once and that Edmond told
Hendricks to look at Williams and said, "that's what happens
when somebody crosses him." Because Edmond cannot show
prejudice, he is not entitled to an evidentiary hearing on
this claim.

*Edmond v. State*, 453 P.3d 1208 (Kan. Ct. App. 2019)

The court finds the KCOA applied the appropriate standards in
considering this claim and agrees that petitioner is not entitled to
relief. First, the preliminary hearing testimony of Ms. Williams was
properly admitted because she was unavailable at the time of trial.
The Confrontation Clause permits the admission of testimonial hearsay
against a defendant when the declarant is "unavailable" at trial and
the defendant had a prior opportunity to cross-examine the
declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Likewise, to the extent petitioner challenges the admission of
Ms. Williams' out-of-court statements through other witnesses, the
KCOA reasonably found that no prejudice resulted. As respondent notes,

the Supreme Court has expressly endorsed the approach of focusing on the prejudice prong of *Strickland*. *Strickland*, 466 U.S. at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

Petitioner next claims his counsel was ineffective because he failed to impeach the testimony of Danny Hendricks. The KCOA reviewed this claim and concluded petitioner was not entitled to relief because he had not shown that the failures to impeach were not the product of trial strategy and because many of the inconsistencies argued by petitioner in fact, were not truly inconsistent when read in context. The KCOA examined six instances of alleged inconsistency and found only one that was "truly inconsistent". Because it found that counsel had cross-examined Mr. Hendricks effectively on that point, it determined counsel's performance was not deficient on that claim. *Edmond*, 2019 WL 6794879, at *7-8.

The court has reviewed the thorough examination of this claim by the KCOA and finds no error in that analysis. As explained by the KCOA, most of the inconsistencies argued by petitioner were not truly inconsistent when seen in context. Likewise, decisions concerning cross-examination are strategic matters generally left to counsel. *See Richie v. Mullin*, 417 F.3d 1117, 1124 (10th Cir. 2005) ("[C]ounsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy."). The petitioner

makes no persuasive argument that counsel failed to adequately impeach Mr. Hendricks.

Respondent asserts that the remainder of petitioner's claims alleging ineffective assistance of counsel are procedurally defaulted. However, as respondent notes, the KCOA addressed petitioner's claim of cumulative error arising from five claims of ineffective assistance of counsel. Petitioner does not present a claim of cumulative error arising from instances of ineffective assistance in this action. However, three of petitioner's claims of ineffective assistance in this matter arguably are related to three of his claims in the cumulative error claim. These claims are: (1) the claim that defense counsel failed to interview, investigate, and subpoena petitioner's sisters, Martha and Parisha Edmond, and Officer Sara Whitlock; (2) the claim that defense counsel did not allow petitioner to present his theory of defense; and (3) the claim that defense counsel failed to review discovery and prepare for trial.

The KCOA rejected the claim that defense counsel failed to call petitioner's sisters and Officer Whitlock on different grounds. First, citing state case law, it found that petitioner had waived the portion of his claim concerning Officer Whitlock by failing to explain in his motion under K.S.A. 60-1507 or his appellate brief what testimony this witness would offer. *Edmond*, 2019 WL 6794879, at *9 (citing *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 838 (2015)("When a litigant fails to adequately brief an issue it is deemed abandoned.")). The claim therefore is barred by procedural default.

Next, petitioner claimed that his sister Martha would have disputed the claim that Hendricks tried to recover his truck from the apartment complex and Parisha would have testified that petitioner did not take Hendricks' keys by force. The KCOA found:

> Edmond does not present any facts or argument that would meet his burden of showing that the failure to call Martha and Parisha did not result from strategy following adequate investigation. Edmond concedes that Martha and Parisha were subpoenaed and served to testify at trial, so trial counsel must have done some investigation and must have known what the witnesses would say when he ultimately decided not to call them. Clearly, the credibility of these witnesses could have been impeached because they were related to Edmond. And although the witnesses' claimed testimony may have been relevant to the robbery charge against Edmond, the testimony would not have been central to Edmond's defense on the charges of attempted second-degree murder, aggravated kidnapping, and aggravated battery of Williams. Thus, based on the record, Edmond fails to show that his trial counsel's performance was deficient and he also fails to show prejudice.

*Edmond v. State*, 2019 WL 6794879, at *11.

The court finds no ground to grant habeas corpus relief. As explained by the KCOA, defense counsel knew of these witnesses and issued subpoenas for them. However, their credibility obviously would have been in issue due to their close relationship to the petitioner, and their testimony, while relevant to the charge alleging petitioner stole Hendricks' truck, would have introduced the question of drug possession by the petitioner. Under *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. The court agrees that their testimony would have been of limited use and finds no prejudice is attributable to the strategic decision not to present them as witnesses.

Next, petitioner's claim that he was not allowed to present his theory of defense appears to rest on his desire to argue that he did not steal Mr. Hendricks' truck but instead traded him drugs in exchange for using it. Defense counsel explained his reasoning to the trial court, and the petitioner agreed to that course on the record. *Edmond*, 2019 WL 6794879, at 10.

The decision to avoid presenting the jury with evidence that petitioner was possibly involved in drug trafficking or other criminal activity was an entirely reasonable strategy and did not deny petitioner effective assistance.

Finally, petitioner's claim that trial counsel failed to review discovery appears to be related to the claim in his state action under 60-1507 that counsel failed to listen to the tapes of his telephone conversations recorded in the jail and therefore was unaware of potentially offensive language contained in them.

Trial counsel stated that had he known that the word "peckerwood" was going to be used at trial, he would have objected. However, the KCOA found that it was unclear whether this statement meant that counsel did not listen to the tapes, or that he had reviewed the tapes and did not realize the word was offensive or, perhaps, simply missed it. It found that even if this was error, it was a single error that

was not cumulative error and that no prejudice was shown. *Edmond*, 2019 WL 6794879, at *11.

This court agrees with the reasoning of the KCOA. Accepting this as an error, the court finds it was not shown to be prejudicial to the petitioner and does not warrant relief.

In sum, the court finds petitioner is not entitled to relief on a claim of ineffective assistance of counsel. The state courts both identified the appropriate legal standard and reasonably applied it to the facts. The remainder of petitioner's claims of ineffective assistance[1] are procedurally defaulted and are not considered by the court.

*Racial bias on the jury*

Petitioner next asserts he was denied a fair trial by the refusal of the trial court to declare a mistrial or to allow him to question jurors about potential racial bias.

At the trial, the evidence presented by the prosecution included a recorded telephone call between petitioner, who was in the county jail, and Ms. Williams, the victim.

The KCOA explained the basis for this claim as follows:

> The crux of Edmond's complaint is that "the all-white jury
> heard evidence that Mr. Edmond, who is black, had used the
> word 'peckerwood,' which one witness testified was a
> racially derogatory term used to describe a white person."

---

[1] The remaining claims presented in the petition that are barred by procedural default are petitioner's claim that counsel failed to object to the testimony of Ms. Fields, the victim's mother; the claim that counsel conceded petitioner's guilt by introducing incriminating information against him; the claim that counsel failed to argue that the charges of attempted second-degree murder and aggravated battery were multiplicitous; the claim that counsel failed to disclose a conflict of interest between himself and petitioner; and the claim that counsel failed to object to the trial court's refusal to allow voir dire concerning the word "peckerwood".

> This reference was heard on the jailhouse telephone recordings admitted in evidence. The record shows that in the course of the rapid-fire, somewhat garbled jailhouse conversations, Edmond exclaimed to Williams, "You got to be sharp," and "[T]hese peckerwoods ain't playing."

*State v. Edmond*, 324 P.3d 1153, 2014 WL 2402001, at *5-6 (Kan. Ct. App. 2014).

Petitioner sought a mistrial. The trial court denied the request, and petitioner renewed it during the instructions conference. In the latter request, petitioner stated that he had heard a juror expressing offense at his use of the term "peckerwood." The trial court again rejected the request, noting the presence of a noise-masking system used in the courtroom during bench conferences muffled sound and the fact that no one else heard the statement petitioner attributed to the juror, including a guard who was nearby. Finally, the trial court noted its own negative assessment of petitioner's credibility. (R., 11CR470, VIII, 468-71 and 507-17.)

Petitioner presented this claim on appeal. The KCOA explained:

> The jailhouse recording was admitted and played for the jury without objection to the "peckerwoods" reference, and Edmond's counsel conducted his cross-examination of Detective Jonker without mentioning it. To the extent this issue depends upon the mere use of that word during the recorded conversations, Edmond failed to contemporaneously object to its admission. We conclude any such evidentiary issue is waived. See *State v. Holman,* 295 Kan. 116, 126-27, 284 P.3d 251 (2012); *State v. Everest,* 45 Kan.App.2d 923, 926-27, 256 P.3d 890 (2011), *rev. denied* 293 Kan. 1109 (2012).
>
> On redirect examination of Detective Jonker, however, the State returned to the recorded telephone conversation and asked about the apparent conspiracy between Edmond and Williams. In the context of these questions, the detective described Edmond's use of "peckerwoods" as "a derogatory statement either towards me or you, I'm assuming." Edmond's

counsel now objected, but not to the word itself. Rather, defense counsel objected to Detective Jonker's assumption that the term was meant to refer to the detective or the prosecutor. Counsel argued this understanding was a "complete supposition" on Detective Jonker's part. Of note, Edmond does not renew or brief this trial objection on appeal, so any challenge to the adequacy of the foundation for the detective's opinion is waived or abandoned. See *Holman,* 295 Kan. at 126-27.

Instead, on appeal, Edmond challenges the *content* of the foundation offered by the State in response to the objection by Edmond's counsel. Upon further questioning by the prosecutor, the detective explained that his interpretation was based on his experience, from which he understood that "peckerwood" means "a white guy typically." Edmond's counsel then approached the bench and moved for a mistrial, stating his "client's concern is he's the one black person in the room; the jury is full of 12 white individuals." Counsel suggested the State had "trotted out racially motivated statements against white people" and that his client was "a little concerned that [the juror] may hold this against him." After considerable discussion, the trial court declined to order a mistrial.

On appeal, Edmond contends the trial court's denial was based on a belief he should "suffer the consequences of his action." We disagree that the trial court's off hand remarks that Edmond should have known that his use of the term on a recorded jail telephone could be used as evidence or that he used the language at his own risk, provided the legal basis for the trial court's denial of Edmond's mistrial motion.

When rejecting the motion for mistrial, the trial court made sufficient findings of fact and conclusions of law. First, the trial court pointed out that the State was only attempting, in response to Edmond's foundation objection, to establish why Detective Jonker thought Edmond was referring to him or to the prosecutor. Moreover, while the term "peckerwoods" was understood by Detective Jonker as an unfavorable reference to a white man, we agree with the trial court that the meaning of the term is not commonly known or generally understood to be particularly offensive in a racial context. For both reasons, the trial court reasonably refused to characterize the detective's testimony as a fundamental failure in the trial.

Finally, because Detective Jonker's explanation of his understanding of the term was the natural consequence of

Edmond's objection to foundation, we regard any error to
be invited by Edmond. See *State v. Divine,* 291 Kan. 738,
742, 246 P.3d 692 (2011). In any event, we conclude that
Edmond has failed to meet his burden to show an abuse of
the district court's discretion in declining to grant a
mistrial.

A related issue was raised the next day after the parties
had rested. Edmond now personally alleged that on the prior
day during the argument at the bench about the mistrial
motion he had heard a particular juror express offense to
his use of the word "peckerwoods." The trial court asked
the prosecutor to speak with the guard because "if [Edmond]
heard that statement, then [one] would suspect the
[district] court guard would have heard that statement,
too." The prosecutor informed the judge that the guard did
not have "information one way or the other that would assist
[the court] in making a determination."

The trial court also discussed at length with both counsel
the masking noise used in the courtroom during bench
conferences. In particular the trial judge stated, "I have
trouble hearing the lawyers at the bench. I have to lean
forward to be able to hear what they are saying over that
pink noise." After considering the matter, the trial judge
specifically found, "I cannot believe [Edmond's] statement
that he heard a juror make that comment over the pink noise
that was on during [the bench conference]."

When the issue was reconsidered on Edmond's motion for new
trial, the State informed the trial court that its
investigation had shown the juror in question was seated
at the farthest possible point removed from Edmond and no
other person in the courtroom had heard the alleged comment.
Since Edmond does not address on appeal either the trial
court's finding that the juror statement was not made or
the facts supporting that finding, he has waived or
abandoned a challenge to that finding, undercutting the
premise of his argument. See *State v. McCaslin,* 291 Kan.
697, 709, 245 P.3d 1030 (2011); *Hodges v. Johnson,* 288 Kan.
56, Syl. ¶ 7, 199 P.3d 1251 (2009) (Appellate courts do not
reweigh the evidence or credibility determinations
supporting trial court findings of fact.).

Edmond also does not address one of the two remedies his
attorney requested of the trial court—a cautionary
instruction to the jury as a whole. The trial judge
considered and rejected giving a cautionary instruction
regarding the "peckerwoods" reference, stating, "I would
basically be telling the jury that the defendant made a

racist statement, and I wouldn't want to do that." A reasonable person could take such a view and, in any event, the issue is waived for a lack of briefing.

In passing, Edmond addresses another remedy requested by the defense—that the trial court should have questioned the juror identified by Edmond about her purported comment. The trial court again believed this could prejudice Edmond because, like the proposed cautionary instruction, it would draw "more attention to [Edmond's use of 'peckerwoods'] and would do more harm than good." A reasonable person could agree with the trial court, especially because after some inquiry it specifically discounted that the juror made such a comment. As a result, we find no abuse of discretion. We also consider Edmond's cursory briefing on this point to be a waiver or abandonment of the issue on appeal. See *State v. Anderson,* 291 Kan. 849, 858, 249 P.3d 425 (2011).

*State v. Edmond*, 324 P.3d 1153, 2014 WL 2402001, at *6-7 (Kan. Ct. App. 2014)

In the present action, petitioner again challenges the failure to grant a mistrial on his concerns regarding the word "peckerwoods" in the recording played at trial.

Petitioner is entitled to habeas corpus relief on this claim only if he shows that the failure "'was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" *Gray v. Whitten*, 815 F. App'x, 240, 244 (10th Cir. 2020)(quoting *Hooks v. Workman*, 689 F.3d 1148, 1180 (10th Cir. 2012)).

The court finds petitioner has failed to make this showing. The trial court made specific findings concerning the difficulty of hearing in the courtroom when the noise-masking system was in use and its own conclusion concerning petitioner's credibility. The information developed during petitioner's motion for a new trial

supports the finding that there was no remark by a juror concerning petitioner's language in the record. Finally, the trial court's decision to refrain from instructing the jury on the language in the video to avoid highlighting it was reasonable.

As shown, the KCOA thoroughly discussed the issue, described petitioner's various failures to present or preserve arguments on this claim, and reasonably concluded the trial court did not abuse its discretion in refusing to grant petitioner's request for a mistrial. This court concludes the findings and reasoning of both the trial judge and the KCOA are reasonable and well-supported, and there is no suggestion that either the state district court or the appellate court unreasonably applied established law.

Petitioner has not presented any evidence or argument sufficient to overcome their findings and has not shown that he was denied fundamental fairness by the denial of a mistrial. The court denies relief on this claim.

*Sufficiency of the evidence*

Petitioner next challenges the sufficiency of the evidence against him. The standard of review for such a challenge in habeas corpus is well-established. In *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the Supreme Court held that evidence is sufficient if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

The Supreme Court has recognized that "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*).

The Court explained:

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (*quoting Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Id.*

The KCOA analyzed petitioner's claim as follows:

> Edmond's sole argument is that Williams' testimony at the preliminary hearing did not support his convictions. That is generally true, but other evidence did support the convictions. We have detailed most of the incriminating evidence in the Factual and Procedural Background section of this opinion. Hendricks' observations, the surveillance videotapes from the apartment complex, and Williams' contemporaneous statements made to numerous persons about the time of the attack were consistent with each other and, taken as a whole, clearly showed Edmond's guilt. To reweigh Williams' preliminary hearing testimony against this evidence would exceed our standard of review. Considering all the evidence in the light most favorable to the prosecution, a rational factfinder could have concluded Edmond was guilty beyond a reasonable doubt.

*State v. Edmond*, 324 P.3d 1153 (Kan. Ct. App. 2014)

The prosecution's case included the testimony of Danny Hendricks; the victim's mother, Dorothy Fields; Debra Hermes, a

physician's assistant who examined Ms. Williams; and Detective Benjamin Jonker; it also included at least one recorded telephone call made at the Sedgwick County Jail between petitioner and Ms. Williams. The observations and testimony of the witnesses were consistent with a prolonged attack on Ms. Williams by the petitioner and support his convictions. While Ms. Williams gave contrary testimony at the preliminary hearing, the great weight of the evidence supports the decision of the jury, and the recorded telephone conversation introduced provides an explanation for her motive to change her account of the events that caused her injuries.

This court agrees that the evidence, when viewed in the light most favorable to the prosecution, is more than sufficient to satisfy the *Jackson* standard. Petitioner is not entitled to relief on this ground.

### Conclusion

For the reasons set forth, the court concludes petitioner is not entitled to habeas corpus relief and will dismiss the petition.

Under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability should issue "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court identifies the specific issue that meets that showing. 28 U.S.C. § 2253.

The court has considered the record and declines to issue a certificate of appealability.

IT IS, THEREFORE, BY THE COURT ORDERED the petition for habeas corpus is dismissed and all relief is denied. No certificate of

appealability will issue.

**IT IS SO ORDERED.**

DATED:  This 6th day of September, 2022, at Topeka, Kansas.


S/ Sam A. Crow

SAM A. CROW
U.S. Senior District Judge